876 F.2d 501
 1989 A.M.C. 2358, Prod.Liab.Rep.(CCH)P 12,188
 NICOR SUPPLY SHIPS ASSOCIATES, Nicor Supply Ships, Inc.,
Acadian Supply Ships Associates, A Limited
Partnership, through its general partner
Acadian Supply Ships, Inc.
and
Digicon, Inc., and Digicon Physical Corporation, Plaintiffs-Appellants,
v.
GENERAL MOTORS CORPORATION, Stewart & Stevenson Services,
and Halter Marine, Defendants-Appellees.
 No. 88-3510.
 United States Court of Appeals,
Fifth Circuit.
 July 5, 1989.
 
 C. Gordon Starling, Jr., G. Beauregard Gelpi, New Orleans, La., for Digicon, Inc.
 David L. Carrigee, Kimbley A. Kearney, New Orleans, La., for Nicor, et al.
 Kevin R. Tully, W.K. Christovich, New Orleans, La., for Stewart & Stevenson.
 Thomas Otman Kuhns, Frank Cicero, Jr., Douglas J. Kurtenbach, Chicago, Ill., Stephen K. Conroy, Metairie, La., for General Motors.
 Charles E. Lugenbuhl, Stanley J. Cohn, Stefan Kazmierski, New Orleans, B. Ralph Bailey, Collins C. Rossi, Metairie, La., for Halter Marine.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before CLARK, Chief Judge, RUBIN, and DAVIS, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 The district court rendered summary judgment dismissing the claims of both the boat-owner and the time-charterer of a vessel that the builder of the vessel and the manufacturer and distributor of its engines were liable in tort for loss of the vessel and other property allegedly damaged by the explosion of the vessel's engine. We affirm the judgment dismissing the vessel-owner's claim for damage to the vessel. We reverse, however, the judgment dismissing the time-charterer's claim for damage to property it had placed on board the vessel since this property, removable when the charter ended, was not part of the vessel itself.
 
 I.
 
 2
 In 1980, Nicor Supply Ships purchased the M/V Acadian Sailor, a 216-foot, diesel-electric powered, offshore supply vessel built by Halter Marine, Inc., with a one-year warranty for its engines. A year later, Nicor time-chartered the vessel to Digicon, Inc. for a base period of two years with annual options to renew for a maximum of six years.
 
 
 3
 Digicon engaged Newpark Shipyard in Houston, Texas, to modify the vessel for oceanographic research by welding a superstructure on the stern deck and creating a reel deck and heliport. Digicon also placed seismic equipment--guns, cables, reels, computers, and compressors--on the vessel. The structural changes and added equipment cost more than $7.8 million. The charter agreement provided that Digicon might remove the installed structures and equipment at the end of the charter, and return the vessel to Nicor in its pre-charter condition. Nicor did not assign to Digicon any of its rights or warranties against the builder of the vessel or the manufacturer of its parts. Digicon, in turn, had no obligation to repair or maintain the vessel. Throughout the term of the charter, Nicor supplied a crew and retained operational control of the vessel.
 
 
 4
 Early on an April morning in 1984, off the coast of Galveston, Texas, a fire erupted in the vessel's engine room near the No. 2 main engine. The fire, which incapacitated the ship and burned out of control for three days, caused more than $2 million in damage to the vessel and approximately $8 million in damage to the equipment Digicon had installed on it. While the district court did not establish the cause of the fire in its findings of fact, Nicor contends, based on its post-casualty investigation, that the fire was caused by a faulty fuel injector and fuel-cooling system in the No. 2 main engine, a Series 149 Detroit Diesel Allison.
 
 
 5
 Nicor and Digicon sued several parties: General Motors Corp., the manufacturer of the Series 149 Detroit Diesel Allison; Halter Marine, Inc., the shipbuilder which installed the engine; Stewart & Stevenson Services, the regional distributor of General Motors' engine which, with Halter, installed the engine; Kennedy Engine Co., the manufacturer of the fuel injectors used in the engine; and Williams Diesel Services, Inc., the last party to have overhauled the No. 2 main engine before the casualty. Nicor claimed that the defendants were liable in tort for damages to the vessel, and Digicon sought to recover for damage to its equipment and its loss of profit from being unable to use the vessel.
 
 
 6
 The district court dismissed Nicor's claim for damage to the vessel as barred by the Supreme Court's decision in East River Steamship Corp. v. Transamerica Delaval, Inc.[1] and this court's decision in Shipco 2295, Inc. v. Avondale Shipyards, Inc.[2] Six months later, upon discovering that General Motors knew of a defect or design flaw in the No. 2 main engine--that the fuel injectors used in the engine could not withstand hot fuel--Nicor sought to reinstate its cause of action, claiming that General Motors had failed to warn Nicor of this defect. The district court denied Nicor's motion, and dismissed Digicon's tort claims against General Motors, Halter, and Stewart & Stevenson. Both Nicor and Digicon appeal.
 
 II.
 
 7
 In East River Steamship Corp. v. Transamerica Delaval, the Supreme Court held that a ship-owner may not recover from the builder of a vessel or the manufacturer of its parts for damage to the vessel's engine allegedly caused by the defective design of its turbines, stating:
 
 
 8
 a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself.[3]
 
 
 9
 The Court found that the "tort concern with safety is reduced when an injury is only to the product itself," and that actions to recover for such economic damage should be "most naturally understood as a warranty claim ..., mean[ing] simply that the product has not met the customer's expectations."[4]
 
 
 10
 In East River, the Supreme Court addressed only the negligent manufacture of a product; it did not discuss whether the purchaser of a vessel may recover in tort against the manufacturer for failing to warn of a defect in that product. The Court, in fact, noted that "[w]e do not reach the issue whether a tort cause of action can ever be stated in admiralty when the only damages sought are economic."[5]
 
 
 11
 Nicor attempts to avoid the East River bar by claiming that General Motors was guilty of a different sort of negligence--"knowingly placing a defective.... [e]ngine into the stream of commerce and ...negligently failing to warn [Nicor] of the known dangers inherent in its use." Nicor contends that the Court's circumscription of cognizable tort claims in East River permits it to recover for failure to warn of a defect, as distinguished from negligence in the manufacture of the product.
 
 
 12
 Two courts, the Eleventh Circuit in Miller Industries v. Caterpillar Tractor Co.,[6] acting before East River, and a New Jersey District Court in McConnell v. Caterpillar Tractor Co.,[7] acting after East River, have distinguished between a manufacturer's negligence occurring "as part of the manufacturing process" and a manufacturer's negligent failure to warn of a known defect.[8] Miller Industries, upon which the McConnell court relied, held that the purchaser of the defective product may recover in tort for the manufacturer's negligent failure to warn of a defect, at least when the manufacturer has "discovered [the defect] after the engine was already on the market," and "the warranty does not expressly disclaim negligence."[9] Both courts reasoned that a manufacturer's negligence after manufacture has been completed "goes not to the quality of the product that the buyer expects from the bargain, but to the type of conduct which tort law governs as a matter of social and public policy."[10]
 
 
 13
 In both Miller Industries and McConnell, the failure-to-warn claim was predicated on knowledge gained by the manufacturer after the product had been delivered. In this case, while we, of course, credit Nicor's allegations that General Motors knew that its Series 149 engine was defective and that this defect caused the fire that damaged the M/V Acadian Sailor,[11] Nicor has neither asserted nor adduced any evidence to support an inference that General Motors discovered the defect in the engine subsequent to its manufacture. Moreover, the warranty under which Nicor purchased the M/V Acadian Sailor stated that it was "expressly in lieu of ... any non-contractual liabilities including product liabilities based upon negligence or strict liability." Because Nicor has not alleged that General Motors discovered the defect after manufacture and that its negligence, therefore, occurred apart from the manufacturing process, and because the contract between General Motors and Nicor expressly disclaimed General Motors' liability for negligence arising out of the purchase of the engine, Nicor's claim does not fall into the possible exception to East River carved out by the Miller Industries and McConnell courts.
 
 
 14
 While failing to warn a purchaser of a defect in a product known at the time of manufacture is, of course, different from manufacturing a defective product, both negligent acts occur during the manufacturing process and before delivery of the product to the buyer. We are unable to assign to either act a relatively higher level of consciousness of wrongdoing, and thus do not discern a meaningful legal difference between them. Nicor's second cause of action is but a variant of its first claim, attempting to saddle a manufacturer with liability for damages that the Supreme Court has refused to impose. Were we to allow Nicor to succeed on its second claim, we would invite all purchasers of self-damaging products that were negligently manufactured but beyond the coverage of the warranty to style their complaints in terms of the manufacturer's negligent failure to warn of a known defect. Permitting recovery on such grounds would frustrate the Supreme Court's plain intention that a manufacturer be liable for the damage a product causes to itself as a result of negligent manufacture only to the extent that the parties have contractually agreed to apportion such liability.
 
 
 15
 We, therefore, affirm the district court's summary judgment dismissing Nicor's claim. In so doing, we intimate no opinion concerning whether Nicor would have stated a cause of action had it alleged that General Motors had discovered a defect in the Series 149 engine after its manufacture.
 
 III.
 
 16
 Digicon sued General Motors, Halter, and Stewart & Stevenson for damage to the seismic equipment it had placed on board and for loss of use of the vessel it had chartered from Nicor. Digicon claims that it should be allowed to recover because it suffered a non-economic injury--the loss of property other than the vessel itself.
 
 
 17
 In East River, the Supreme Court prohibited recovery for "the failure of [a] product to function properly," unless "the defective product damages other property."[12] While the Court instructed that damage caused by a vessel's turbine to itself and the vessel did not constitute damage to "other property," it gave no other guidance on how to distinguish the "product,"[13] for which recovery in tort may not be had, from property "other" than the product, for which recovery is permissible.
 
 
 18
 In Shipco, we found that "the finished vessel" delivered by the manufacturer to the purchaser "is the product"--"the object of the contract"[14]--and that parts of the vessel damaged by its malfunctioning propeller and steering mechanisms[15] were not, therefore, "other property." "[A] defect in one component of the item sold that causes damage to unrelated components of that item [does not] constitute[ ] damage to 'other property.' "[16]
 
 
 19
 Digicon does not seek, however, to recover for damage to parts of the vessel that Halter delivered to Nicor in 1980. Instead, Digicon asserts that the renovations and equipment it installed on the M/V Acadian Sailor in 1981, worth almost $8 million, is "other property" for which recovery is permitted. The district court rejected this contention, finding that the "additions and modifications made by Digicon were permanently attached; they were incorporated into the vessel and became appurtenances of the ship, integral parts of the whole product."
 
 
 20
 On a motion for summary judgment, a "court must ...draw every reasonable inference in favor of the party opposing the motion."[17] We find no support for the district court's finding that Digicon's additions to the M/V Acadian Sailor, made over a year after Nicor had purchased the vessel, were integral parts of the vessel. Digicon chartered a supply vessel with one deck level, and an open deck aft of the stacks. According to the record, Digicon deployed its seismic equipment--guns, cables, reels, computers, and compressors--on the main deck, and added two decks aft of the stacks--a streamer reel deck and a reel deck cover. Neither the added equipment nor the structural changes were "the object of the contract" between Halter and Nicor;[18] the M/V Acadian Sailor, as delivered to Nicor, was the product of that bargain.
 
 
 21
 Moreover, Digicon retained a contractual right "to remove its equipment and any installation from the vessel," even those items welded to the vessel, when the charter expired. Counsel for Stewart & Stevenson admitted to the district court that when Digicon is "done with that charter, they could convert it back to a supply vessel had they wanted to do it, but to do that, they would have had to put [the vessel] in a shipyard, ... send in welders and strip off decks, [and] remove equipment that had been bolted down." Counsel for General Motors similarly stated that Digicon may "simply take [the added items] off. They [may] take off the compressors. They [may] melt out the wells [sic] and take out their equipment." If the value of the equipment and structural additions, estimated at approximately $8 million, exceeded the cost of removal, we must infer that Digicon would have taken the necessary steps to remove them at the end of the charter period. This equipment was, therefore, not part of the vessel.
 
 
 22
 A time-charterer has a direct proprietary interest in physical property that it adds to, has the legal right to remove, and will, as a matter of economic reality, likely reclaim from a leased vessel. Such additions remain in effect the property of the time-charterer, apart from the vessel itself which it is obliged to return. These appurtenances must be considered "other property," separate from the product that the manufacturer originally sold, if the distinction enunciated in East River between a "product" and "other property" is to have any meaning. Because these items were not part of the contract under which the vessel was sold, damage to them is an injury for which their proprietor may recover in tort. Digicon's recovery for the loss of these goods should not exceed, however, their estimated value at the expiration of the charter, less the cost of removal.
 
 
 23
 In a parenthetical description of another case, contained in a footnote, this court recently stated in Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.[19] that the "loss of cargo is not damage to 'other property' within [the] meaning of East River."[20] That statement relies upon a similar observation in our earlier opinion in Louis Dreyfus Corp. v. 27,946 Long Tons of Corn.[21] To the degree, if at all, that these statements suggest that the additions to the vessel involved in this case are not "other property," they are obiter dicta, not precedent. They may help to explain the rationale of the particular opinion in which they were uttered, but they do not bind us as the law of the circuit.
 
 
 24
 Having sustained "physical injury to a proprietary interest," Digicon may recover for economic loss as well,[22] but its recovery for loss of profits is limited to losses resulting from its inability to use the "other property" it placed on the vessel as a result of the casualty. Digicon is not entitled to recover for its loss of profits resulting from its inability to use the vessel itself or for its inability to use the "other property" if that resulted solely from the disability of the vessel itself. If the district court finds that the added equipment was totally destroyed in the casualty, Digicon is, of course, entitled to recover only for loss of the equipment, not for lost profits.[23]
 
 
 25
 The judgment of the district court is, therefore, AFFIRMED in part and REVERSED in part, and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)
 
 
 [2]
 825 F.2d 925 (5th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988)
 
 
 [3]
 476 U.S. at 870-71, 106 S.Ct. at 2302 (footnote omitted)
 
 
 [4]
 Id. at 872, 106 S.Ct. at 2302-03; see Shipco, 825 F.2d at 927; Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp., 519 F.2d 171, 179, 181 (5th Cir.1975) (Gee, J., dissenting), cert. denied, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976)
 
 
 [5]
 East River, 476 U.S. at 870-871 n. 6, 106 S.Ct. at 2302 n. 6; see also Prosser & Keeton, Torts Sec. 92, p. 657 (5th ed.)
 
 
 [6]
 733 F.2d 813 (11th Cir.1984)
 
 
 [7]
 646 F.Supp. 1520 (D.NJ.1986)
 
 
 [8]
 Id. at 1526 (citing East River, 476 U.S. at 860-861, 106 S.Ct. at 2297); cf. City of Greenville v. W.R. Grace & Co., 827 F.2d 975, 981-82 (4th Cir.1987)
 
 
 [9]
 Miller Industries, 733 F.2d at 818; see McConnell, 646 F.Supp. at 1526
 
 
 [10]
 McConnell, 646 F.Supp. at 1526 (citing Miller Industries, 733 F.2d at 818); see Schwartz, The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine, 58 N.Y.U.L.Rev. 892 (1983)
 
 
 [11]
 See Murphy v. Georgia-Pacific Corp., 628 F.2d 862, 866 (5th Cir.1980); Harbor Ins. Co. v. Trammell Crow Co., Inc., 854 F.2d 94, 98 (5th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989)
 
 
 [12]
 East River, 476 U.S. at 866-67, 106 S.Ct. at 2300
 
 
 [13]
 Ibid
 
 
 [14]
 Shipco, 825 F.2d at 928-29
 
 
 [15]
 See id. at 928 n. 1
 
 
 [16]
 Id. at 928
 
 
 [17]
 Murphy, 628 F.2d at 866; Harbor Ins. Co., 854 F.2d at 98
 
 
 [18]
 Shipco, 825 F.2d at 928
 
 
 [19]
 866 F.2d 752 (5th Cir.1989)
 
 
 [20]
 Id. at 763 n. 16; see Louis Dreyfus Corp. v. 27, 946 Long Tons of Corn, 830 F.2d 1321, 1328 n. 5 (5th Cir.1987); Cargill, Inc. v. Doxford and Sunderland, Ltd., 782 F.2d 496, 497-98 (5th Cir.1986)
 
 
 [21]
 830 F.2d 1321, 1328 n. 5 (5th Cir.1987)
 
 
 [22]
 State of Louisiana Ex Rel. Guste v. M/V Testbank, 752 F.2d 1019, 1028 & 1023, 1029 (5th Cir.1985) (en banc), cert. denied, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986); Domar Ocean Transp. v. M/V Andrew Martin, 754 F.2d 616, 619 (5th Cir.1985); Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 308-09, 48 S.Ct. 134, 135, 72 L.Ed. 290 (1927); cf. Lloyd's Leasing Ltd. v. Conoco, 868 F.2d 1447, 1450-51 (5th Cir.1989) (Higginbotham, J., concurring in part and dissenting in part)
 
 
 [23]
 See Harper and James, 2 The Law of Torts, Sec. 25.7, p. 1314 (1956); 18 A.L.R.3d Secs. 5, 6, 8, 9, pp. 504-514, 516-21 and Supp. pp. 97-99; Restatement of Torts (2d) Secs. 910, 928, pp. 470, 543-44